UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KELLY SHAFFSTALL, an individual, | CASE NO. C18-1656-JCC |
| Plaintiff, | ORDER |
| v. | |
| OLD DOMINION FREIGHT LINE, INC., a Virginia corporation, | |
| Defendant. | |

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 41). Having considered the parties' briefing and the relevant record, the Court hereby GRANTS the motion in part and DENIES the motion in part for the reasons explained herein.

## I. BACKGROUND

Defendant is a freight company specializing in less-than-truckload shipping. (Dkt. No. 44 at 2–3.) As part of its shipping business, Defendant maintains service centers in various regions, including the Pacific Northwest. (*Id.*) Defendant's Pacific Northwest service centers contain maintenance shops, which maintain, diagnose, repair, and manage third-party repair of its equipment. (*Id.*) Those maintenance shops are staffed by maintenance technicians. (*Id.*)

Defendant requires technicians to work forty hours per week and generally prohibits them from working overtime. (*See* Dkt. No. 56-9 at 5.) To track the hours that technicians work,

Defendant requires technicians to "punch in" and "punch out" using its Kronos fingerprint time clock. (Dkt. No. 45-1 at 1–3.) Technicians punch in and out by pressing either the "Punch In" or "Punch Out" button on the time clock's home screen, placing their finger on a scanner, and waiting until a green light appears. (*Id.*) Once the green light appears, the Kronos system automatically uploads information about the fingerprint punch to Defendant's SAP software, which Defendant uses for timekeeping and payroll. (Dkt. No. 45 at 2.)

Although relatively easy to use, the Kronos system is not foolproof. For example, an employee might forget to punch in or out at the start or end of the day, fail to punch in or out for lunch, or punch in or out at the correct time but do so twice. (*See* Dkt. No. 44-17 at 2.) Because such errors are bound to occur, Defendant relies on managers to correct mistakes. (*See id.*) Managers correct mistakes by logging into SAP, reviewing a technician's time punches, and either approving those punches or changing them to reflect the technician's actual time worked. (*See id.* at 2; Dkt. No. 45 at 2.) Defendant instructs its managers that they should change employee time records only in "limited circumstances" and "may not change a time record to show fewer or more hours than actually worked." (*See* Dkt. No. 44-17 at 2.)

In April 2007, Defendant hired Plaintiff as a technician at its Seattle service center. (Dkt. No. 53 at 1.) After Plaintiff worked as a technician for a year and a half, Defendant promoted him to maintenance manager in October 2008. (*Id.*) Once promoted, Plaintiff became responsible for overseeing Defendant's policy against overtime, monitoring technicians' work hours, and approving their weekly payroll. (*Id.* at 1–2.) Plaintiff was instructed on how to review and approve technicians' work hours by Don Orlowski, the then-regional maintenance manager for the Pacific Northwest and Plaintiff's direct supervisor. (*Id.* at 2.) According to Plaintiff, Mr. Owloski's instructions were consistent with Defendant's general policy: "it was critical for [Defendant] to maintain an accurate record of the technicians' actual work hours and that legally [Plaintiff] was permitted to change a technician's clock time to ensure an accurate record of his

actual hours worked."[1] (*Id.*)

For the next seven and a half years, Plaintiff appears to have worked without incident. (*See id.* at 2–3.) In April 2016, however, Plaintiff was diagnosed with cancer. (*Id.* at 3.) Then, in July 2017, Plaintiff underwent surgery to remove cancerous tumors from his stomach and liver. (*Id.*) The surgery caused significant damage to Plaintiff's stomach that required emergency surgery a few days later. (*Id.*) These surgeries and the treatment of Plaintiff's cancer forced Plaintiff to start taking intermittent leave. (*See id.*)

Initially, Mr. Orlowski approved Plaintiff's leave. (*Id.*) But in October 2017, Mr. Orlowski was replaced by Lorrin Wallace, who became responsible for approving Plaintiff's leave. (*See* Dkt. No. 44 at 2.) After Mr. Wallace assumed Mr. Orlowski's role, Plaintiff began communicating with Mr. Wallace about Plaintiff's cancer. On December 5, 2017, for example, Plaintiff emailed Mr. Wallace,

> I got a call from my Dr., and my PET scan from last week came up negative!!! No living, or active cancer!!! Not completely out of the woods, still have to be monitored as it could come back, but they are taking me off the chemo meds!

(Dkt. No. 44-3 at 2.) Upon learning that Plaintiff had cancer, Mr. Wallace allegedly asked Francis Doyle, a technician working under Plaintiff, "if [Plaintiff's] condition negatively affected his ability to oversee the shop and help [the technicians] with work issues."[2] (Dkt. No. 51 at 2.)

---

[1] Defendant argues that Mr. Orlowski's alleged instructions are inadmissible hearsay that cannot be considered at summary judgment. (Dkt. No. 55 at 4.) However, Mr. Orlowski's instructions were "statement[s] . . . offered against an opposing party . . . [that were] made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(2)(D). The statements are, therefore, statutorily defined as non-hearsay, and the Court may consider them. *Id.*

[2] Defendant argues that Mr. Doyle's declaration should be excluded because Plaintiff did not produce the declaration in response to Defendant's request for statements, affidavits, and declarations of prospective witnesses. (*See* Dkt. No. 55 at 4–5.) However, Plaintiff objected to Defendant's request, arguing that it "invades attorney-client privilege and work-product." (*See* Dkt. No. 56-1 at 5.) And Defendant did not move to compel Plaintiff to respond to its request as part of the motion to compel that Defendant filed on September 13, 2019. (*See* Dkt. No. 35 at 6.) Moreover, even if the motion did address that request, Defendant never renewed the motion

ORDER
C18-1656-JCC
PAGE - 3

Mr. Doyle says that he told Mr. Wallace "no," Plaintiff's condition had not impacted his work. (*Id.*)

Over the next several months, Mr. Wallace approved Plaintiff's requests to take time off for medical appointments. (*See* Dkt. No. 53 at 4.) In requesting time off, Plaintiff did not ask for unpaid leave under Washington's Family Leave Act ("WFLA"), Wash. Rev. Code §§ 49.78.010 *et seq.* (*See id.* at 3.) Instead, Plaintiff used the substantial amount of paid sick leave that he had accrued. (*See id.* at 3–5; Dkt No. 44-4 at 2.)

On March 8, 2018, Plaintiff received bad news from his doctor: his cancer had returned, and he needed surgery to remove the tumor and repair a hernia caused by his two previous surgeries. (Dkt. No. 53 at 4.) Plaintiff informed Mr. Wallace that the surgery would occur on Thursday, March 29, and that Plaintiff would be "out . . . the 29th through April 3rd or 4th." (Dkt. No. 44-2 at 2.) Mr. Wallace responded by offering to approve the payroll for the Seattle technicians while Plaintiff was out recovering from surgery. (*See* Dkt. No. 42-2 at 8.) Plaintiff declined Mr. Wallace's offer. (*See id.*)

While Plaintiff was out on paid sick leave, Mr. Wallace received an email on April 2, 2018, about service centers with unapproved payroll. (Dkt. No. 44-11 at 2.) One of those centers was the center in Seattle. (*Id.* at 3.) Realizing that Plaintiff must not have approved the Seattle payroll, Mr. Wallace emailed Plaintiff, "Last week when I asked if you wanted me to approve payroll for your shop you said no you would take care of it. I see it on the unapproved list. Have

following the telephonic conference between the parties and the Court. (*See* Dkt. No. 40 at 2.) By failing to either move to compel Plaintiff to disclose the declaration or renew its motion to compel, Defendant waived any objection to Plaintiff using the declaration at summary judgment. *See Washington v. Matheson Flight Extenders, Inc.*, Case No. C17-1925-JCC, Dkt. No. 65 at 13 n.6 (W.D. Wash. 2020).

Defendant also argues that the Court should not consider Mr. Doyle's statement about Mr. Wallace's inquiry because the statement is inadmissible hearsay. (*See* Dkt. No. 55 at 5.) But like Mr. Orlowski's statement, Mr. Wallace's statement is admissible as a "statement . . . offered against an opposing party . . . [that was] made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(2)(D).

you had an opportunity to approve this yet?" (Dkt. No. 44-12 at 3.) Although Plaintiff approved the payroll that same day, (*see* Dkt. Nos. 44 at 4, 53 at 5), he did not immediately respond to Mr. Wallace's email, (*see* Dkt. No. 44-12 at 2). According to Mr. Wallace, the lack of a response prompted him to log into SAP to complete the Seattle payroll. (Dkt. No. 44 at 4.) Mr. Wallace says that once he was in SAP, he "noticed that the time records were inexplicably uniform." (*Id.*) That uniformity, Mr. Wallace claims, led him to suspect that Plaintiff was altering technicians' time records so that their records reflected a uniform 40.00 hours worked instead of their actual time worked. (*See id.* at 7–8; Dkt. No. 42-1 at 8.)

Over the next few days, Mr. Wallace says that he monitored the Seattle technicians' punch times to see what changes Plaintiff made to those times. (Dkt. No. 42-1 at 10.) The records for that period show that Plaintiff changed four technicians' punch times to 40.00 hours and one technician's punch time to 41.00 hours.[3] (*See* Dkt. Nos. 44-13 at 2, 45-2.) After seeing those changes, Mr. Wallace contacted Tom Lillywhite, Defendant's regional manager of human resources and development in the Pacific Northwest, on April 11, 2018. (Dkt. No. 42–3 at 6–7.) Mr. Wallace and Mr. Lillywhite allegedly discussed how Mr. Wallace might continue to

---

[3] Plaintiff argues that the Court should not consider the Excel spreadsheets and screenshots showing the payroll Plaintiff approved because the spreadsheets and screenshots are (1) hearsay and (2) inadmissible under the best evidence rule. (*See* Dkt. No. 48 at 12) (Citing Fed. R. Evid. 401, 602, 802, 1002). However, the spreadsheets and screenshots are admissible hearsay because they are records made and kept in the ordinary course of Defendant's business. *See* Fed. R. Evid. 803(6); (Dkt. Nos. 44 at 5–7, 45 at 2). In addition, the spreadsheets are admissible under the best evidence rule because they are native downloads of the "display working times" reports that Mr. Wallace viewed in Defendant's SAP system, which makes the spreadsheets originals. *See* Fed. R. Evid. 1001(d) ("For electronically stored information, 'original' means any printout—or other output readable by sight—if it accurately reflects the information."); (Dkt. No. 44 at 5, 45 at 2). The screenshots, on the other hand, are admissible because they are duplicates "produced by a[n] . . . electronic . . . process or technique that accurately reproduces the original." Fed. R. Evid. 1001(d); *see* Fed. R. Evid. 1003 (stating that duplicates are admissible to the same extent as originals); *Barkan v. Health Net of Cal., Inc.*, 2018 WL 8061009, slip op. at 3 (C.D. Cal. 2018) (holding that screenshots are duplicates); (Dkt. No. 44 at 5–7) (stating that the screenshots "display[] the same information and are in the same format" that Mr. Wallace originally viewed).

investigate whether Plaintiff was improperly altering time records. (*Id.*) According to Mr. Wallace, that investigation entailed him spending an evening[4] reviewing "display working times" reports to identify "(a) whether [Plaintiff] had been making the same changes every pay period; (b) whether [Plaintiff's] times were limited to certain employees; and (c) whether other shops in his region were completing payroll in the same manner." (Dkt. No. 44 at 5.) The next morning, Mr. Wallace emailed the following update to Mr. Lillywhite:

> I spent most of the evening reviewing time in SEAM. This has been happening for years with every employee Kelly supervises. I also checked the other PNW shops and they look good. I contacted payroll and was given access to a report where I can view actual time and corrected time. Based on what I saw, some adjustments favor the techs but most take time away from them. I will be at the SEA shop Monday morning. I would like it if Kyle could join me as I talk to the techs individually. I will reach out to you for guidance once I am in SEA.

(Dkt. No. 44-14 at 2.) Mr. Lillywhite responded, "That sounds good. Very concerning here." (*Id.*)

At the same time as Mr. Wallace was investigating Plaintiff's payroll practices, controversy arose over Plaintiff's absence from work on April 12, 2018, and April 16, 2018. When a manager such as Plaintiff expects to be absent, Defendant requires them to notify their supervisor "as far in advance as possible." (Dkt. No. 43-5 at 2.) If advance notice is not possible, then Defendant requires the manager to notify their supervisor "no later than 1 hour prior to [their] scheduled start time." (*Id.*) Defendant does not allow managers to work from home if they are physically able to go to work. (Dkt. Nos. 42-3 at 15, 44 at 9.) The parties dispute whether Plaintiff complied with these policies. For April 12, Plaintiff claims, "I had a medical appointment . . . which was approved by Lorrin Wallace." (Dkt. No. 53 at 5.) Mr. Wallace says, "I have no record that [Plaintiff] requested April 12, 2018 off." (Dkt. No. 58 at 3.) For April 16, Plaintiff admits that he did not notify anyone in advance that he would not be at work, but he

---

[4] Although Mr. Wallace says that he looked at the reports on the evening of April 13, (*see* Dkt. No. 44 at 5), he sent a summary of his findings to Mr. Lillywhite on April 13, 2018, at 8:08 a.m., (*see* Dkt. No. 44-14 at 2). This strongly suggests that Mr. Wallace looked at the reports on April 12, not April 13.

points out that he emailed Mr. Wallace at 8:19 a.m., "I have not made it in to the shop this morning, up with a fever most of the night, plan on heading in later." (Dkt. No. 49-3 at 19.) Mr. Wallace forwarded Plaintiff's email to Mr. Lillywhite at 2:32 p.m. (*Id.*) Two minutes later, Mr. Lillywhite emailed DeeDee Cox, Defendant's director of HR development, "I just followed up with Lorrin and Kelly (SEA mgr) NCNS ["no call/no show"] last Wednesday and he said he would be in today but Lorrin hasn't seen him yet. Today would be his second NCNS." (Dkt. No. 49-3 at 24.)

One hour after Mr. Wallace informed Mr. Lillywhite that Plaintiff did not show up to work on April 16, Mr. Lillywhite sent a draft termination summary to Mr. Wallace. (Dkt. No. 49-3 at 4–5.) The summary said that the "termination reason" was "adjusting employees' clock times and failing to report to work." (*Id.* at 5.) The summary expanded on those reasons as follows:

> It was discovered by Lorrin Wallace . . . that [Plaintiff] has been adjusting his employees times to reflect 8 hours and 5 days a week regardless of their actual[] hours worked. . . . Kelly never reported to work on 4/11/18[5] and emailed to say he would come in on 4/16/18 but never showed up for work. These are failures to report to work and is taken very serious by the company. Based upon these facts termination is warranted.

(*Id.*) On April 17, Mr. Wallace met with Plaintiff in person. (Dkt. No. 42-1 at 15.) Mr. Lillywhite attended the meeting by telephone. (*Id.*) The accounts of the meeting differ substantially. (*Compare id.*, *with* Dkt. No. 53 at 5–6.) Mr. Wallace and Mr. Lillywhite claim Plaintiff admitted that he changed technicians' times to a uniform 8 hours and that he blamed his prior manager, Mr. Orlowski, for his understanding of how to complete payroll. (Dkt. Nos. 42-1 at 15, 42-3 at 19.) Plaintiff claims he told Mr. Wallace and Mr. Lillywhite that he adjusted technicians' times to reflect their actual hours worked. (Dkt. No. 53 at 5–6.) The parties agree, however, that Mr. Wallace informed Plaintiff at the meeting that Defendant had decided to terminate Plaintiff's

---

[5] Mr. Lillywhite erroneously wrote in the draft termination summary that Plaintiff was absent on April 11, 2018. (*See* Dkt. No. 42-3 at 11.) Plaintiff was actually absent on April 12, 2018. (*See id.*)

1    employment. (Dkt. No. 42-1 at 16.)

2       Following Plaintiff's termination, Plaintiff filed a complaint in King County Superior

3 Court, alleging that Defendant had discriminated against him in violation of Washington's Law

4 Against Discrimination ("WLAD"), Wash. Rev. Code §§ 49.60.010 *et seq.*; wrongfully

5 discharged him in violation of public policy; and violated the WFLA. (Dkt. No. 1-1 at 7–8.)

6 Defendant timely removed the case to this Court based on diversity jurisdiction. (*See* Dkt. No. 1

7 at 1.) Defendant now moves for summary judgment on all of Plaintiff's claims. (*See generally*

8 Dkt. No. 41.)

9 **II.    DISCUSSION**

10      **A.     Summary Judgment Standard**

11       "The court shall grant summary judgment if the movant shows that there is no genuine

12 dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

13 Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute

14 about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

15 verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

16 In deciding whether there is a genuine dispute of material fact, the court must view the facts and

17 justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party.

18 *Id.* at 255. The court is therefore prohibited from weighing the evidence or resolving disputed

19 issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

20       "The moving party bears the initial burden of establishing the absence of a genuine issue

21 of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a moving party fails to

22 carry its initial burden of production, the nonmoving party has no obligation to produce anything,

23 even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*

24 *& Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But once the moving

25 party properly makes and supports their motion, the nonmoving party "must come forward with

26 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## B.     WLAD Claim

Wash. Rev. Code § 49.60.180(3) prohibits employers from "discriminat[ing] against any person in compensation or in other terms or conditions of employment because of . . . the presence of any sensory, mental, or physical disability."[6] An employer can "discriminate" against someone with a disability in two distinct ways. *See Pulcino v. Fed. Express Corp.*, 9 P.3d 787, 793 (Wash. 2000). First, an employer discriminates against an employee if the employer takes an adverse employment action against the employee because of the employee's disability. *See id.* This type of deliberate discrimination is known as "disparate treatment." *Id.* Second, an employer discriminates against an employee if the employer fails to reasonably accommodate the employee's known disability. *See* Wash. Admin. Code § 162-22-025; *Pulcino*, 9 P.3d at 793. This type of discrimination is known as a "failure to accommodate." *See Pulcino*, 9 P.3d at 793.

Here, Defendant argues that Plaintiff cannot establish either a disparate treatment or a failure to accommodate claim. (*See* Dkt. No. 41 at 13–21.) The Court concludes that summary judgment is inappropriate as to the first claim but appropriate as to the second.

### 1.     Disparate Treatment

When bringing a disparate treatment claim, an employee's "ultimate burden . . . is to

---

[6] Washington "look[s] to federal cases for guidance in construing analogous federal statutes." *Davis v. Microsoft Corp.*, 70 P.3d 126, 132 (Wash. 2003). Accordingly, the Court will draw from federal cases in construing the WLAD unless it has reason to believe that Washington would take a different approach. *See Matheson Flight Extenders*, Case No. C17-1925-JCC, Dkt. No. 65 at 4–9.

present evidence sufficient for a trier of fact to reasonably conclude that . . . discriminatory animus was more likely than not a substantial factor in the adverse employment action." *Hill v. BCTI Income Fund-I*, 23 P.3d 440, 449 (Wash. 2001) (emphasis omitted). One way an employee can carry their burden is through the Supreme Court's burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 702 (1973). *See Hegwine v. Longview Fibre Co.*, 172 P.3d 688, 696 (Wash. 2007); *Parsons v. St. Joseph's Hosp. & Health Care Ctr.*, 856 P.2d 702, 809 (Wash. Ct. App. 1993) (observing that an employee can "meet his or her burden of production in any way that yields evidence from which a rational trier of fact could find unlawful discrimination"). Under that framework, an employee must first establish a *prima facie* case of unlawful discrimination. *See Hegwine*, 172 P.3d at 696. If the employee establishes a *prima face* case, "the burden shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty.*, 404 P.3d 464, 473 (Wash. 2017). "The employer's burden is merely one of production," and "[t]he employer need only introduce 'evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993)). Once the employer offers a nondiscriminatory reason, the burden shifts back to the employee to produce evidence that the employer's reason was pretext for discrimination. *Id.*

### i.    *Plaintiff's* Prima Facie *Case*

An employee usually establishes a *prima facie* case of disparate treatment by showing "(1) she was within a statutorily protected class, (2) she was discharged by the [employer], (3) she was doing satisfactory work, and (4) after her discharge, the position remained open and the employer continued to seek applicants with qualifications similar to the [employee]." *Mikkelsen*, 404 P.3d at 470. Here, the parties do not dispute that Plaintiff has established the first and second elements of his *prima facie* case; Plaintiff's cancer is a disability within the meaning of Wash. Rev. Code § 49.60.040(7)(a)(i), and Defendant fired him. (*See* Dkt. Nos. 41 at 15, 48 at 16.)

Defendant argues, however, that Plaintiff cannot make out a *prima facie* case because he has not shown that he was replaced by someone without a disability or that he was satisfactorily performing his job. (*See* Dkt. Nos. 41 at 15, 55 at 5.)

Defendant's first argument misstates the requirements for a *prima facie* case in Washington. In *Mikkelsen v. Public Utility District No. 1 of Kittitas County*, 404 P.3d 464, 473 (Wash. 2017), the Washington Supreme Court clarified "that the *McDonnell Douglas* framework does not require a plaintiff to prove that she was replaced by a person outside her protected group to establish a prima facie case of discrimination." Instead, "a plaintiff need only show that her position was not eliminated." *See id.* at 472–73. Because Defendant admits that it did not eliminate Plaintiff's managerial position after Defendant fired Plaintiff, (*see* Dkt. No. 55 at 5), Plaintiff has established the fourth element of a *prima facie* case of disparate treatment.

Defendant's second argument "conflate[s] the minimal inference needed to establish a prima facie case with the specific, substantial showing [an employee] must make at the third stage of the *McDonnell Douglas* inquiry." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002). "The requisite degree of proof necessary to establish a prima facie case . . . is *minimal* and does not even need to rise to the level of a preponderance of the evidence." *Id.* (emphasis in original) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)). Plaintiff met his burden by offering his own declaration and the declarations of three maintenance technicians who worked under him.[7] When read in the light most favorable to Plaintiff, those declarations show that Defendant had few—if any—complaints about Plaintiff's performance during his first ten years as manager, (*see* Dkt. No. 53 at 3); that Plaintiff regularly communicated with technicians to ensure the accuracy of their payroll, (*see* Dkt. Nos. 50 at 2, 51 at 2–3, 52 at 2); and that Plaintiff was an "honest, hard-working guy who put everything into

---

[7] Defendant argues that the Court should not consider any of the technicians' declarations because Plaintiff did not disclose those declarations in discovery. (*See* Dkt. No. 55 at 4–5.) But as previously explained, Defendant waived any objection to Plaintiff using those declarations at summary judgment.

operating [Defendant's] Seattle maintenance shop," (*see* Dkt. No. 51 at 4).

Despite these declarations, Defendant contends that the evidence indisputably shows that Plaintiff violated company policy by adjusting his technicians' times to an even 8 hours per day, 5 days per week regardless of their actual time worked. (*See* Dkt. No. 41 at 15–17.) Defendant's evidence is strong: it shows that Plaintiff made over 6,000 edits to technician times during his 10 years as a manager, (*see* Dkt. No. 45-2), and that there was far less variance in the time Plaintiff approved at the Seattle shop for the March 23–29, 2018 pay period than in the time that managers approved at the Billings, Salt Lake City, and Portland shops for the same period, (*compare* Dkt. No. 44-13, *with* Dkt. No. 44-16). This evidence could lead a reasonable jury to conclude that Plaintiff improperly adjusted his technicians' times.

And yet, Defendant's evidence is also disputed. In a sworn declaration based on personal knowledge, Plaintiff states that that he only ever changed clock times to reflect the actual hours that technicians worked. (*See* Dkt. No. 53 at 5); *see also Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001) ("Self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory."). Plaintiff's statement is supported by the three maintenance technicians who submitted declarations. For example, one technician states that his time for the March pay period was uniform because he had a "smooth transition from first to second shift" and that "at no time did [Plaintiff] change my actual work hours." (*See* Dkt. No. 51 at 3–4.) Another technician explained why his time was always 40 hours per week, saying,

> The maintenance technician job . . . guaranteed a forty-hour week and it was frowned upon if the technicians did not work a full forty hours per week. At the same time [Defendant] had a strict No Overtime policy. So, us technicians always worked exactly forty hours per week. My pay stub did not say 39.93 hours, or 39.86, or 40.10 or any other number of hours worked except 40 hours per week. I made sure I worked forty hours per week, and I got paid for forty hours per week.

(Dkt. No. 50 at 2.) The same technician also said that before making changes to a technician's time, Plaintiff would communicate directly with the technician to ensure that any changes

reflected the technician's actual hours worked. (Dkt. No. 50 at 2–3.)

Whether Plaintiff's statement and the technicians' explanations can be reconciled with Defendant's evidence is not up for the Court to decide. After all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 572 U.S. at 656 (quoting *Anderson*, 477 U.S. at 249). Because Plaintiff's evidence creates a genuine issue as to whether Plaintiff complied with Defendant's timekeeping policy, Plaintiff has established all four elements of a *prima facie* case of disparate treatment.

*ii.*      *Defendant's Nondiscriminatory Explanation for Firing Plaintiff*

Defendant claims that Mr. Wallace and Mr. Lillywhite "acted for legitimate, non-discriminatory reasons—[Plaintiff's] falsification of employee records." (Dkt. No. 41 at 18.) Defendant supports its claim by pointing to the summary of Plaintiff's termination and the deposition of Mr. Lillywhite. (*See id.*) (citing Dkt. Nos. 43-4, 42-3). These pieces of evidence satisfy Defendant's burden of production under the *McDonnell Douglas* burden-shifting framework. *See Mikkelsen*, 404 P.3d at 473.

*iii.*      *Plaintiff's Evidence of Pretext*

Once an employer offers a non-discriminatory reason for its action, the employee must respond with "evidence sufficient for a trier of fact to reasonably conclude that . . . discriminatory animus was . . . a substantial factor in the adverse employment action." *Hill*, 23 P.3d at 449. At this stage, "it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015). "'This is 'because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)); *Hill*, 23 P.3d at 449 (quoting *Carle v. McChord Credit Union*, 827 P.2d 1070, 1077 (Wash. 1992)) ("[I]t is the jury's task to choose

between [competing] inferences.").

In this case, Plaintiff offers several forms of evidence showing that Defendant may have fired him because of his disability. First, as previously discussed, Plaintiff offers enough evidence for a jury to conclude that he did not falsify employee records. If a jury reaches that conclusion, then it could "reasonably infer from the falsity of [Defendant's] explanation that [Defendant] is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 134 (2000).

Second, Plaintiff argues that the timing of his firing is evidence of discriminatory intent. Plaintiff states that he approved payroll the same way for 10 years without anyone questioning the hours he submitted. (*See* Dkt. No. 53 at 3.) But in 2016, Plaintiff began taking time off because of his cancer. (*See id.* at 3–4.) The next year, Plaintiff's supervisor was replaced by Mr. Wallace. (*See* Dkt. No. 44 at 2.) Shortly thereafter, Mr. Wallace allegedly inquired into whether Plaintiff's cancer was negatively impacting Plaintiff's ability to oversee the Seattle shop. (*See* Dkt. No. 51 at 2.) Then, less than one year later—and shortly after Plaintiff was forced to go through a new round of surgery—Mr. Wallace pushed for Plaintiff to be fired because of behavior that Plaintiff had apparently engaged in for 10 years. (*See* Dkt. No. 42-1 at 10–16.) This "suspicious timing" is evidence "from which an inference of discriminatory intent might be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Third, Plaintiff claims that Defendant has offered shifting and false explanations for why it terminated him. When Mr. Lilywhite first drafted an explanation for why Plaintiff was to be fired, Mr. Lilywhite wrote that the "termination reason" included "failing to report to work" on April 12, 2018, and April 16, 2018. (Dkt. No. 49-3 at 5.) Mr. Lilywhite seemed to stand behind this initial explanation at his deposition, stating that Defendant would have fired Plaintiff for the two no calls/no shows even if Plaintiff had not falsified employee records. (*See* Dkt. No. 49-4 at 45–46.) Yet, Defendant now claims that Plaintiff's attendance was a "secondary issue" included on Plaintiff's termination form as a matter of course. (*See* Dkt. No. 41 at 12.) "Substantial

changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994). That is especially true where, as here, Plaintiff alleges that Mr. Wallace knew that one of the proffered reasons for Plaintiff's termination was false because Mr. Wallace approved Plaintiff taking leave on April 12, 2018.[8] (Dkt. No. 53 at 5.)

In sum, a jury could conclude that Plaintiff did not falsify employee records; that his supervisor questioned his subordinate about his disability; that he was fired less than one month after undergoing surgery for behavior he had engaged in for ten years without complaint; and that Defendant has given false and shifting explanations for its decision.[9] A jury could, therefore,

---

[8] Plaintiff's evidence on this point is thin. When Plaintiff was asked at his deposition whether he went to work on April 12, he responded, "I couldn't say off the top of my head. I really couldn't." (Dkt. No. 56-7 at 3.) Plaintiff now says in a declaration that Mr. Wallace allowed Plaintiff to go to a medical appointment on April 12, (Dkt. No. 53 at 5), but Plaintiff has not produced any medical records showing he had an appointment that day, (*see generally* Dkt. No. 56-6). And while Plaintiff claims Mr. Wallace acknowledged in a meeting request that Plaintiff would not be at work on April 12, (Dkt. No. 48 at 10), the request appears to refer to a meeting scheduled for April 4, (*see* Dkt. No. 58 at 1–4) ("[S]ince you and I will both be out of the office at this time, let's move this to the 11th."). However, even if Plaintiff lacks strong evidence to support his present account, it is up to the jury decide whether to credit that account. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015) (holding self-serving declarations based on personal knowledge were sufficient to create triable issues of fact in a disability discrimination case); *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (observing the jury usually resolves inconsistencies between deposition testimony and declarations submitted to oppose summary judgment).

[9] Defendant argues that even if the foregoing is true, Plaintiff's disability could not have motivated Defendant to fire Plaintiff because Mr. Lillywhite, the one with final authority to fire Plaintiff, did not know about Plaintiff's disability. (*See* Dkt. No. 41 at 18–19) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 (2003)). However, a final decisionmakers' lack of knowledge does not shield an employer from liability if a biased subordinate "influenced or was involved in the decisionmaking process." *France v. Johnson*, 795 F.3d 1170, 1176 (9th Cir. 2015). Here, a reasonable jury could conclude that Mr. Wallace influenced and was involved in the decision to fire Plaintiff: Defendant describes how Mr. Wallace investigated Plaintiff, (*see* Dkt. No. 41 at 5–7, 15–17); emphasizes that "Lilywhite trusted Wallace's judgement because of Wallace's professionalism and experience with the timekeeping systems at issue," (*see id.* at 7); and argues that "a reasonable jury must reach the same conclusion as Mr. Wallace," (*see id.* at 17). Defendant cannot simultaneously rely on Mr. Wallace's investigation and expertise while avoiding liability for his influence and actions.

find that Defendant's decision was substantially motivated by Plaintiff's disability. Accordingly, the Court DENIES Defendant's motion for summary judgment as to Plaintiff's disparate treatment claim.

### 2.    Failure to Accommodate

In a reasonable accommodation case, "the central idea is that an employer cannot fire an employee for poor job performance if the poor job performance was due to sensory, mental or physical [disability] and reasonable accommodation would have rectified the problem." *Parsons*, 856 P.2d at 703. Plaintiff's case does not resemble a reasonable accommodation case. Although Plaintiff's complaint occasionally uses language found in such cases, (*see* Dkt. No. 1-1 at 2) ("Defendant failed to engage in the interactive process and failed to exhaust all reasonable accommodations . . . ."), the thrust the complaint is that Plaintiff was performing his job adequately but was fired because Defendant had an unstated problem with his disability, (*see id.* at 3–6). Consequently, the central issue appears to be whether Defendant acted with a discriminatory motive, not whether Defendant fired Plaintiff for poor job performance that could have been rectified by a reasonable accommodation. *See Parsons*, 856 P.2d at 703–04. Nevertheless, Defendant addresses a potential failure to accommodate claim "out of an abundance of caution," (Dkt. No. 55 at 10), and Plaintiff seeks to preserve that claim in opposing Defendant's motion for summary judgment, (*see* Dkt. No. 48 at 19–21).

To succeed on his failure to accommodate claim, Plaintiff must prove (1) he had a disability that substantially limited his ability to perform his job; (2) he was qualified to perform the essential functions of his job; (3) he gave Defendant notice of the disability and its accompanying substantial limitations; (4) upon notice, Defendant failed to affirmatively adopt measures that were available and medically necessary to accommodate his disability; and (5) Defendant's failure to accommodate his disability affected the terms, conditions, or privileges of his employment. *Exby-Stolley v. Bd. of Cty. Comm'rs*, 906 F.3d 900, 914 (10th Cir. 2018) (observing that federal circuits require a failure to accommodate to be tied to an adverse

employment action); *Riehl v. Foodmaker, Inc.*, 94 P.3d 930, 934 (Wash. 2004) (listing the first four elements of a failure to accommodate claim). Defendant argues that Plaintiff cannot establish elements (3) and (4) because Plaintiff asked for a specific accommodation (taking paid sick leave), Defendant provided that accommodation, and Plaintiff never told Defendant that the accommodation he requested was inadequate. (*See* Dkt. No. 41 at 19–20.) Plaintiff responds that instead of allowing him to take paid sick leave, Defendant should have engaged in an interactive process, determined the full extent of Plaintiff's disability, and offered a more substantial accommodation, such as "provid[ing] the Plaintiff extended leave followed by a temporary work-from-home schedule to allow him to properly recover." (Dkt. No. 48 at 20.)

### i. *Plaintiff's Notice*

Plaintiff adequately notified Defendant of his disability. In a series of emails sent to Mr. Wallace and others, Plaintiff informed Defendant that he had cancer and that he needed to take paid sick leave to seek treatment. (*See* Dkt. Nos. 49-1 at 51, 49-2 at 2–14.) "This notice . . . trigger[ed] [Defendant's] burden to take 'positive steps' to accommodate [Plaintiff's] limitations" even though it did not "inform[] [Defendant] of the full nature and extent of [Plaintiff's] disability." *See Goodman v. Boeing Co.*, 899 P.2d 1625, 1269–70 (Wash. 1995).

### ii. *Defendant's Accommodations*

Although Plaintiff adequately notified Defendant of his disability, summary judgment is appropriate because Defendant reasonably accommodated Plaintiff's disability by allowing him to use his paid sick leave to seek treatment. In his declaration, Plaintiff does not clearly identify how his disability impacted his ability to perform his duties. (*See generally* Dkt. No. 53.) In fact, Plaintiff says, "I did my best to perform my duties and not allow my medical issues to negatively impact shop operations." (*Id.* at 5.) But Plaintiff does say that his medical issues forced him to take time off while he sought treatment, which Defendant allowed him to do by using paid sick leave. (*See id.* at 3–6.) Permitting the use of accrued sick leave is a reasonable accommodation. *See* 29 C.F.R. § 1630, App'x ("Accommodations could include permitting the use of accrued

paid leave or providing additional unpaid leave for necessary treatment."); *Hankins v. The Gap, Inc.*, 84 F.3d 797, 801–02 (6th Cir. 1996); *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995); *Arndt v. Ford Motor Co.*, 247 F. Supp. 3d 832, 850 (E.D. Mich. 2017). Thus, by allowing Plaintiff to use his paid sick leave to seek necessary treatment for his cancer, Defendant reasonably accommodated Plaintiff's disability.

Plaintiff argues that this was not enough. According to Plaintiff, Defendant should have engaged Plaintiff in an interactive process "so that [Defendant] could identify the precise limitations and the types of accommodations[] which would have been most effective." (*See* Dkt. No. 48 at 21.) However, "[f]ailure to participate in the interactive process is not a ground for liability unless the employee has proven . . . that a reasonable accommodation existed and the employer unreasonably failed to provide it." *Garner v. School Dist. of Phil.*, 63 F. Supp. 3d 483, 494 (E.D. Pa. 2014) (quoting *Deily v. Waste Mgmt. of Allentown*, 55 F. App'x 605, 607 (3d Cir. 2003)); *MacSuga v. County of Spokane*, 983 P.2d 1167, 1171 (Wash. Ct. App. 1999) ("Although it is strongly recommended, there is no absolute requirement for discussions between employer and employee."). Plaintiff has not offered any evidence to prove that the accommodations he suggests in his response brief were "medically necessary" to accommodate his disability. *See Hill*, 23 P.3d at 452–53; *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[L]egal memoranda . . . cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion . . . ."). Consequently, Plaintiff's failure to accommodate claim fails even if Defendant should have engaged Plaintiff in an interactive process. The Court therefore GRANTS Defendant's motion for summary judgment as to Plaintiff's failure to accommodate claim.

### C. Wrongful Discharge Claim

The tort of wrongful discharge against public policy is an exception to the general principle that employees in Washington are terminable at-will. *See Rose v. Anderson Hay & Grain Co.*, 358 P.3d 1139, 1141 (Wash. 2015). The tort applies only if the plaintiff can prove

that their dismissal violated a clear mandate of public policy. *Id.* at 1142. A dismissal violates a clear mandate of public policy if it falls into the following four categories:

> (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.[10]

*Id.* (quoting *Gardner v. Loomis Armored Inc.*, 913 P.2d 377, 379 (Wash. 1996)).

Plaintiff argues that his case falls into category 3 because Defendant terminated him for "exercising his rights under the WFMLA/FMLA."[11] "(Dkt. No. 48 at 23.) Yet, Plaintiff admits in his declaration that he "did not complete Washington Family Medical Leave request forms" and that he instead used his accrued sick leave whenever he had a medical appointment. (Dkt. No. 53 at 3–4.) Given that Plaintiff did not request WFLA leave—indeed, he failed to complete the forms that Defendant mailed to him, (*see* Dkt. No. 43-7 at 3)—Defendant could not have fired him for exercising his rights under the WFLA. Accordingly, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's wrongful discharge claim.

---

[10] If a dismissal does not fall into one of those categories, then the plaintiff may bring a wrongful discharge claim under the Perritt framework. *Rose*, 358 P.3d at 1141. That framework involves four elements:

> (1) the existence of a "clear public policy" (clarity element), (2) whether "discouraging the conduct in which [the employee] engaged would jeopardize the public policy" (jeopardy element), (3) whether the "public-policy-linked conduct caused the dismissal" (causation element), and (4) whether the employer is "able to offer an overriding justification for the dismissal" (absence of justification element).

*Id.* at 1143. Plaintiff does not argue that his claim survives under that framework. (*See* Dkt. No. 48 at 23.)

[11] Plaintiff's argument seems to be inconsistent with his complaint. In his complaint, Plaintiff does not allege that he was fired for exercising his rights under the WFLA. Instead, Plaintiff alleges that he was "terminat[ed] . . . based on [his] medical condition and disability status," thereby "violat[ing] the well-established public policies that are designed to assist workers with disabilities and form the basis of Washington's Law Against Discrimination." (Dkt. No. 1-1 at 6, 8.)

### D. WFLA Claim

The WFLA entitles eligible employees to take unpaid leave because of a "serious health condition that makes the employee unable to perform the functions of the position of the employee." Wash. Rev. Code § 49.78.220(d). The WFLA also prohibits employers from interfering with, restraining, or denying an employee's exercise of their rights under the WFLA. Wash. Rev. Code § 49.78.300(1)(a). An employee alleging an interference or denial claim must show (1) they were eligible for the WFLA's protections; (2) the WFLA covered their employer; (3) the WFLA entitled them to leave; (4) they notified their employer of their intent to take leave; (5) their employer denied them WFLA benefits; and (6) they were prejudiced by the denial of benefits. *See Crawford v. JP Morgan Chase NA*, 983 F. Supp. 2d 1264, 1270–71 (W.D. Wash. 2013). Defendant argues that summary judgment is appropriate because Plaintiff has not established elements (4), (5), and (6). (*See* Dkt. No. 41 at 23.) The Court concludes that although Plaintiff has established element (4), Plaintiff has not established elements (5) or (6).

#### 1. Notice

"The WFLA mirrors its federal counterpart and provides that courts are to construe its provisions in a manner consistent with similar provisions of the [Family Medical Leave Act ("FMLA")]." *Washburn v. Gymboree Retail Stores, Inc.*, C11-0822-RSL, Dkt. No. 111 at 12 (W.D. Wash. 2012). Accordingly, the FMLA's notice provisions apply to Plaintiff's WFLA claim. Under those provisions, an employee "need not expressly assert rights under the FMLA or even mention the FMLA" when they seek leave. 29 C.F.R. § 825.302(c). Rather, the employee must "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA–qualifying leave, and the anticipated timing and duration of the leave." *Id.*; *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1130 (9th Cir. 2003) (holding employee adequately notified her employer when she said that she needed to take several months of maternity leave).

In this case, Plaintiff provided sufficient notice when he sent several emails making Defendant aware that he needed to take intermittent leave due to his serious health condition.

(*See* Dkt. Nos. 49-1 at 51, 49-2 at 2–14.) Those emails notified Defendant that Plaintiff might be entitled to WFLA leave even if they did not mention the WFLA. *See* 29 C.F.R. § 825.302(c); *Xin Liu*, 347 F.3d at 1130.

### 2.   Denial of Benefits

Once an employee duly informs an employer of their need to take leave that might fall under the WFLA, the employer has a "duty to initiate a procedure to determine whether [the employee] qualifie[s] for [WFLA] leave" and to notify the employee accordingly. *Xin Lu*, 347 F.3d at 1130. That is what happened here. In May 2016, Defendant assessed Plaintiff's situation and concluded that he was eligible for WFLA/FMLA leave. (*See* Dkt. No. 43-7 at 3.) Defendant then mailed Plaintiff a "Certification of Health Care Provider form," which Defendant requires employees to complete when they seek WFLA/FMLA leave for a serious health condition. (*See id.*) Despite being aware of this requirement, (*see* Dkt. No. 42-2 at 6), Plaintiff did not complete the required form, (*see* Dkt. No. 43-7 at 3). Consequently, Defendant sent Plaintiff another letter stating, "While you are eligible for FMLA-qualifying leave, your absences beginning on 5/26/2016 have not been considered for, or approved as, FMLA leave because you have failed to return the Certification of Health Care Provider form." *Id.* This was a proper basis for denying Plaintiff WFLA leave: federal regulations state that "[a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave."[12] 29 C.F.R. § 825.302(d).

---

[12] Plaintiff claims that he did not formally request WFLA leave because he feared retaliation. (Dkt. No. 53 at 3.) However, assuming that fear of retaliation can excuse an employee's obligation to comply with their employer's requirements for taking WFLA leave, Plaintiff has not shown that his fear was reasonable. Plaintiff claims that he "mentally questioned" whether Defendant fired Jason Larrance, a Seattle technician, for taking medical leave for amputation surgery. (Dkt. No. 53 at 3.) To prove that Defendant may have fired Mr. Larrance for taking medical leave, Plaintiff offers Mr. Larrance's declaration. (Dkt. No. 52.) That declaration is a tangle of inconsistencies: Mr. Larrance first states that Defendant employed him for "about four months in 2017," but he later says that "in 2013, after I'd been with [Defendant] for over a year, I had to take sick time for amputation surgery." (*See id.* at 1–2.) Mr. Larrance also says that he

### 3. Prejudice

Even if Defendant improperly denied Plaintiff WFLA leave, Plaintiff has failed to show that he suffered prejudice as a result. The WFLA entitles an employee to twelve workweeks of unpaid leave during any twelve-month period. Wash. Rev. Code § 49.68.220(1). If an employee wishes to take paid leave, then they must look to their employer's paid leave policy. Defendant's paid leave policy states that if an employee wants to take paid leave while they are on WFLA leave, their paid leave will run concurrent with their WFLA leave. (Dkt. No. 49-1 at 47.) Consequently, "[Plaintiff] can no show no prejudice because even if [he] had been informed and taken [WFLA] leave, [his] accrued leave would have been reduced the same amount under [Defendant's] leave policy." *Liston v. Nevada ex rel. Its Dep't of Bus. & Indus.*, 311 F. App'x 1000, 1002 (9th Cir. 2009). The Court therefore GRANTS Defendant's motion for summary judgment as to Plaintiff's FMLA claim.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment (Dkt. No. 41).

//

---

took "sick time," not WFLA leave. (*See id.* at 2.) Furthermore, Mr. Larrance's claim that he took leave (of any kind) is contradicted by Defendant's employment records. (*See* Dkt. No. 45-2.) Those records show that Mr. Larrance worked every day during his short employment with Defendant, which lasted from February 19, 2016, to March 22, 2016. (*See id.*) Finally, Defendant explains that it fired Mr. Larrance because he lied on his employment application. (*See* Dkt. No. 55 at 12–13.) That explanation is consistent with the following timeline: (1) On February 8, 2016, Mr. Larrance filled out an employment application stating that he left employment with Encon Washington because "work slowed down," (Dkt. No. 57-1 at 2); (2) on February 29, 2016, Encon Washington completed a "previous employer record check" form, indicating that it fired Mr. Larrance for "theft of gasoline," (Dkt. No. 57-3 at 2); (3) on March 16, 2016, Lisa DeHart emailed Plaintiff, explained that Mr. Larrance failed to disclose that Econ Washington fired him for stealing gasoline, and instructed Plaintiff to fire Mr. Larrance for "falsification of application," (Dkt. No. 57-4 at 2). Plaintiff offers no evidence that Ms. DeHart's instructions were pretext for retaliation.

DATED this 30th day of March 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE